**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
**(Central Division)**

| | |
|---|---|
| In re<br><br>**ARKLOW LIMITED PARTNERSHIP,**[1]<br><br>Debtor | **Chapter 11**<br><br>**Case No. 20-40523** |

**AFFIDAVIT OF CRAIG JALBERT, CHIEF**
**RESTRUCTURING OFFICER, IN SUPPORT OF FIRST DAY MOTIONS**

Pursuant to 28 U.S.C. § 1746, I, Craig Jalbert, hereby declare as follows:

1. I am the Chief Restructuring Officer of Arklow Limited Partnership ("Arklow"), The International Golf Club, LLC ("IGC") and Wealyn, LLC ("Wealyn").[2]

2. I make this affidavit in support of the following motions filed by the Debtors: (a) *Debtors' Motion For (A) The Approval of Debtor-In-Possession Financing, (B) The Entry of Scheduling Order Regarding a Continued Hearing on Debtor-In-Possession Financing, And (C) Additional Relief* (the "DIP Motion"); (b) *Motion by Debtors And Debtors-In-Possession to (A) Pay Prepetition Wages, Salaries, Expenses, And Benefits And (B) Use Existing Payroll Accounts And Business Forms* (the "Wage Motion"); and (c) *Debtors' Motion for Joint Administration* (the "Joint Administration Motion", and together with the DIP Motion and the Wage Motion the "First Day Motions").

---

[1] Joint administration requested. The affiliated debtors, along with the last four digits of each debtor's federal tax identification number, are as follows: Arklow Limited Partnership (9883), The International Golf Club, LLC (9792) and Wealyn, LLC (9883).
[2] Arklow, IGC and Wealyn are collectively referred to in this affidavit as the "Debtors."

1

774032

3. Except as otherwise indicated, all statements in this affidavit are based upon (a) my review of relevant documents; (b) information supplied to me by members of the Debtors' management and employees, or other professionals retained by the Debtors; (c) my discussions with various parties, including professionals, familiar with the Debtors and their operations; and (d) my opinion based upon my experience and knowledge.

4. As Chief Restructuring Officer, I participated in the Debtors' decisions to file voluntary petitions for relief under chapter 11 of the United States Bankruptcy Code (the "Bankruptcy Code"). I have reviewed the Debtor's voluntary petitions and the First Day Motions. The First Day Motions seek to ensure, among other things, the preservation of the value of the Debtors' assets.

## BACKGROUND

5. The Debtors collectively operate the International Golf Club (the "International"), which includes two award winning golf courses, a fifty-four (54) room hotel, restaurant and function room. The original nine-hole golf course, built in 1901, was expanded to eighteen holes in 1954, becoming the "Pines Course." In 1972, famed golf course designer Robert Trent Jones modified the Pines Course to its current configuration, an award winning course that is rated as the longest and toughest course in America.

6. In 1999, the current ownership purchased the International and undertook a major expansion, including the construction of a second golf course, the "Oaks Course," designed by Tom Fazio. In 2001, the International officially opened for member play, making it one of the first private golf clubs in New England with two full golf courses.[3]

---

[3] The International also operates a third, nine (9) hole golf course.

7. In addition to its golf courses, the Debtors operate a boutique lodge and signature restaurant, providing a lifestyle destination resort and a full service corporate and social event platform.

8. The U.S. golf industry has been undergoing a substantial market correction in recent years following a 20 year boom in golf course construction, which saw more than 4,500 new courses built from 1986-2005. In that window, the U.S. added more courses than the total existing supply in any other country. Despite golf course closures outweighing new openings for more than ten years, there are still more than 16,000 golf courses in the United States, which is more than five times any other country in the world. Due to the glut of golf courses, The International was required to modify its membership model starting in 2008, changing from a membership that required a deposit of $65,000 and annual dues of $8,000 (a "Deposit Member"), to a model that requires only the annual dues (a "Non-Deposit Member"). Notwithstanding this, The International has seen membership requests continue to constrict, resulting in reduction in cash flow. The recent COVID-19 crisis, which required The International to cease operations, severely impacted The International's working capital, requiring the filing of these bankruptcy cases.

## THE DEBTORS

9. Arklow Limited Partnership ("Arklow"), a Massachusetts limited partnership, owns approximately 700 acres of real estate (the "Real Estate") on which the International operates, consisting of the golf courses and associated buildings, and undeveloped land. Arklow also owns certain of the equipment necessary to operate the International, and the leases the rest, such as golf carts, mowers and turf equipment. The book value of Arklow's assets (exclusive of

3

774032

intercompany claims)[4] is approximately $16 million, with its real estate consisting of most of that value. Arklow has not obtained an appraisal of its assets, but believes that the fair market value of its assets is considerably less than the book value.

10. The general partner of Arklow is Arklow, Inc., a Massachusetts corporation, and Arklow's limited partners are Florence Weadock, Brian Lynch, Daniel Weadock, Ann Specht and Kevin Weadock.

11. The International Golf Club, LLC ("IGC") is a Delaware limited liability company whose sole member is Arklow. ICG provides administrative services to the International, including hotel management and managing the members of the International and holding their membership deposits. IGC leases the International's three (3) golf courses from Arklow. The book value of IGC's assets (exclusive of intercompany claims) is approximately $100,000. IGC has not obtained an appraisal of its assets. IGC's assets consist of computer and office equipment and furniture.

12. As of the Petition Date, there were thirty-nine (39) active Deposit Members and approximately 100 active Non-Deposit Members of the International.

13. Wealyn, LLC ("Wealyn") is a Massachusetts limited liability company whose members are Brian Lynch, Florence Weadock and Arklow. Wealyn manages the food and beverage services for the International. Wealyn's primary asset is its liquor license, the book value of which is approximately $100,000.

---

[4] Arklow and IGC each have inter-company claims against the other. Arklow has a claim against IGC on account of IGC's lease of the golf courses, and IGC has claims against Arklow on account of management and other services provided.

## LIABILITIES

14. As of the Petition Date, Arklow's liabilities consist of secured debt totaling approximately $9,000,000 and unsecured debt totaling approximately $10,400,000 as follows:

    a.  Arklow owes approximately $54,000 in real estate taxes that are secured by a first priority lien on the Real Estate.

    b.  In 2014, Arklow borrowed, on an unsecured basis, approximately $9,000,000 from Bank of America (the "BofA Debt") to fund the International's operations. As a condition to this loan, Bank of America required Florence Weadock to guaranty the debt and to collateralize her guaranty with securities. In exchange for Ms. Weadock's credit support, Arklow executed a guaranty to Ms. Weadock and secured the guaranty with a first priority mortgage in favor of Ms. Weadock on the Real Estate (the "First Mortgage"). Arklow received the entire proceeds of the Bank of America loan.

    c.  In 1999, Arklow borrowed $10,000,000 from Ms. Weadock to purchase the Real Estate. Arklow owes Ms. Weadock approximately $10,400,000 on account of this loan. On or about May 29, 2019, Arklow granted Ms. Weadock a mortgage junior to the First Mortgage to secure this loan (the "Second Mortgage").[5]

    d.  Arklow has non-priority unsecured trade and vendor debt totaling approximately $40,000.

    e.  As of the Petition Date, three (3) parties had filed UCC-1 financing statements against Arklow, Fortress Credit Co., LLC (as assignee of GPSA Leasing, II), TCF National Bank, and DLL Finance, LLC. All three (3) of these UCC-1 filings are associated with equipment leases. Arklow is still reviewing the documents and reserves all of its rights, claims and defenses as to whether such entities have a claim against Arklow or a lien on any of its assets. Two other entities, Deer Credit and Agricredit Acceptance, LLC filed UCC-1 financing statements that lapsed more than eight (8) months prior to the Petition Date, and Arklow reserves all of its rights, claims and defenses as to whether such entities have a claim against Arklow or a lien on any of its assets.

---

[5] Because Ms. Weadock is an insider (as that term is defined in the Bankruptcy Code) of the Debtors, the Second Mortgage was recorded within the one (1) year look back period under Section 547 of the Bankruptcy Code.

774032

15. As of the Petition Date, IGC had priority unsecured debt totaling approximately $24,000, consisting of its accrued payroll liability as of the Petition Date.[6] IGC's non-priority unsecured totaled approximately $9,444,000, consisting of (a) Deposit Member obligations totaling approximately $9,000,000, and (b) trade and vendor debt totaling approximately $444,000. Prior to 2008, in order to become a member of the International, a person is required to provide a deposit to the International. The membership rights and duties are described in the by-laws for the International. There are three different types of memberships in the International, each with its own differing deposit requirements. Upon the resignation of a Deposit Member, the International is obligated to return the resigned Deposit Member's deposit upon the earlier to occur of reissuance of the membership or thirty (30) years, provided that the member is a member in good standing. As of the Petition Date, the International had approximately thirty-eight active Deposit Members, who have provided membership deposits totaling $1,800,000, and approximately 138 resigned Deposit Members, with deposit claims totaling approximately $7,200,000. IGC is still analyzing all potential deposit claims, and reserves all of its rights, claims and defenses with respect to such claims.

16. As of the Petition Date, two (2) parties had filed UCC-1 financing statements against ICG, TCF National Bank and Yamaha Motor Finance Corporation. Both of these UCC-1 filings are associated with equipment leases. ICG is still reviewing the documents and reserves all of its rights, claims and defenses as to whether such entities have a claim against ICG or a lien on any of its assets.

17. As of the Petition Date, Wealyn had non-priority unsecured trade debt of approximately $60,000, and no secured or priority unsecured debts.

---

[6] IGC has filed a motion seeking permission to pay its pre-petition payroll obligations.

**THE FIRST DAY MOTIONS**

18.     The purpose of the Debtors' chapter 11 proceedings is to permit the Debtors to find a buyer for all or substantially all of their assets.  The Debtors sought a buyer prior to filing chapter 11, but could not locate a buyer who was willing to purchase the International with its current debt structure and land zoning restrictions.  The First Day Motions are as follows.

**A.      The DIP Motion.**

19.     The Debtors' recent financial struggles, the COVID-19 pandemic and resulting forced cessation in the Debtors' operations, left the Debtors will little to no cash.  The DIP Motion seeks to borrow approximately $650,000 (the "DIP Loan") from Ms. Weadock to pay the necessary costs of maintaining the Debtors assets while they locate a buyer for those assets.  Attached to the DIP Motion is a budget showing the Debtors' projected disbursements for the first 120 days of these bankruptcy cases.  The proposed DIP Loan will provide for the payment of all expenses necessary to maintain the value of the Debtors' assets, including real estate taxes, insurance and basic maintenance.

20.     Given the COVID-19 pandemic and the fact that the Debtors' are not permitted to conduct operations, a loan from a traditional source was not possible.  Ms. Weadock, who holds a first and second priority mortgage on the Real Estate, was the only source for the DIP Loan.  Ms. Weadock is an Insider of the Debtors (as defined in the Bankruptcy Code).

21.     Absent the DIP Loan, the Debtors would be unable to pay the costs of maintaining the value of their assets, resulting in, among other things, the forced liquidation of their assets at a dramatically reduced return to the Debtors' estates to the detriment of the Debtors and all creditors and interest holders.  The approval of the DIP Loan on the terms set

forth in the DIP Motion is, therefore, in the best interests of the Debtors, their bankruptcy estates and their creditors.

22. I have reviewed the budget attached to the DIP Motion and I believe that it represents the reasonable projections for the Debtors operations for the period in question.

**B.    The Motion to Pay Prepetition Wages and Benefits.**

23. The Debtors filed the Wage Motion seeking authority to pay or honor, in the ordinary course of business, their employees' prepetition wages, reimbursable expenses, associated taxes, and vacation and sick pay obligations. Under the Debtors' standard payroll procedures, the payrolls are processed semi-monthly in arrears. The total amount of the Debtors' prepetition wage obligations is approximately $24,000. No employee will receive more than $12,850 on account of payment of the pre-petition wage obligations and the continued compliance with the Debtors' vacation and sick leave policies.

24. The Wage Motion also seeks authority to pay pre-petition amounts owed for the Debtors' health plan (the "Health Plan"), which is administered through Blue Cross Blue Shield, in the ordinary course of business. I understand that the proposed payments on account of the Health Plan will not exceed the statutory ceilings set forth in 11 U.S.C. § 507(a)(5).

25. It is critical that the Debtors be permitted to pay their prepetition wage and Health Plan obligations in the ordinary course of business. A potential loss (or delay in receipt) of earned wages or salaries would impose a hardship on the employees and may result in the loss of employees at a critical time in these cases. Approval of such payments will assist in preserving the value of the Debtors' assets and bankruptcy estates.

774032

## EMERGENCY RELIEF IS WARRANTED

26. It is my understanding that the Bankruptcy Code requires the existence of immediate and irreparable harm to the Debtors if a pre-petition claim is to be paid within twenty-one (21) days of the Petition Date.

27. As is described above, the Debtors may suffer immediate and irreparable harm if the DIP Motion and the Wage Motion are not granted and the Debtors are unable to pay the necessary costs of preserving their assets, and honor the pre-petition wages and benefits to their employees.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge and belief.

_____
Craig Jalbert, Chief Restructuring Officer

Dated: May 4, 2020

774032