**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS**
(Central Division)

| | |
|---|---|
| In re<br><br>ARKLOW LIMITED PARTNERSHIP,[1]<br><br>Debtor | Chapter 11<br><br>Case No. 20-40523 |

**DEBTORS' MOTION FOR (A) THE APPROVAL OF
DEBTOR-IN-POSSESSION FINANCING, (B) THE ENTRY OF
SCHEDULING ORDER REGARDING A CONTINUED HEARING ON
DEBTOR-IN-POSSESSION FINANCING, AND (C) ADDITIONAL RELIEF**
(Expedited Consideration Requested)

Arklow Limited Partnership ("Arklow"), The International Golf Club, LLC ("IGC") and Wealyn, LLC ("Wealyn", and together with Arklow and IGC the "Debtors"), the debtors and debtors-in-possession in the above captioned cases, move the Court pursuant to Sections 105, 363 and 364 of the United States Bankruptcy Code (the "Bankruptcy Code"), Federal Rules of Bankruptcy Procedure 2002, 4001, and 9014, and MLBR 4001-2, for:

a. The entry, on an expedited basis, of an interim order approving interim debtor-in-possession financing on the terms set forth in this motion, in an amount necessary to avoid immediate and irreparable harm;

b. The entry of a permanent order authorizing secured debtor-in-possession financing of approximately $693,000 (the "DIP Financing") from Ms. Florence Weadock or her designee ("Ms. Weadock"), on the terms set forth in this motion;

c. The granting of liens to Ms. Weadock for the DIP Financing that are senior to all liens, other than the Excepted Liens (as defined below), and that: (i) include all property of the estate, but (ii) shall not attach to any causes of action under Chapter 5 of the Bankruptcy Code or any proceeds of those causes of action; and

---

[1] Joint administration requested. The affiliated debtors, along with the last four digits of each debtor's federal tax identification number, are as follows: Arklow Limited Partnership (9883), The International Golf Club, LLC (9792) and Wealyn, LLC (9883).

      d.      The entry of an order setting a final hearing on the final approval of the DIP Financing.

The Debtors collectively operate the International Golf Club (the "<u>International</u>"), which includes two award winning golf courses, a fifty-four (54) room hotel, restaurant and function room. The original nine-hole golf course, built in 1901, was expanded to eighteen holes in 1954, becoming the "Pines Course." In 1972, famed golf course designer Robert Trent Jones modified the Pines Course to its current configuration, an award winning course that is rated as the longest and toughest course in America. In addition to its golf courses, the Debtors operate a boutique lodge and signature restaurant, providing a lifestyle destination resort and a full service corporate and social event platform.

The U.S. golf industry has been undergoing a substantial market correction in recent years following a 20 year boom in golf course construction, which saw more than 4,500 new courses built from 1986-2005. The glut of golf courses adversely effected the Debtors' cash flow in two ways. First, The International was required to modify its membership model, eliminating the requirement that members submit a deposit of $65,000, and second, overall membership applications declined. The recent COVID-19 crisis, which required The International to cease operations, severely impacted The International's working capital, requiring the filing of these bankruptcy cases.

The Debtors intend to seek a buyer for all or substantially all of their assets. The Debtors sought a buyer prior to filing chapter 11, but could not locate a buyer who was willing to purchase the International with its current debt structure and land zoning restrictions. The Debtors require immediate DIP Financing to, among other things, pay for insurance, real estate taxes, payroll and other costs that are necessary to preserve the value of their assets. The Debtor requests the authority to borrow approximately $85,000 on an expedited basis. Absent the

2

approval of the DIP Financing the Debtors do not have sufficient cash to pay immediate operating expenses. The ability to obtain DIP Financing to pay immediate expenses on an expedited basis is necessary to both permit the Debtors to preserve the value of their assets. Expedited consideration of this motion is therefore warranted.

As is described more below, Ms. Weadock holds two mortgages on Arklow's real estate. The only other liens on the Debtors' assets (collectively the "Excepted Liens") are as follows: (a) real estate taxes owed by Arklow, and (b) various security interests in equipment leased to Arklow and IGC asserted by the lessors of such equipment, to the extent such liens are valid and perfected, and only on the equipment secured by such liens.[2] Ms. Weadock has consented to the priming of her pre-petition liens in conjunction with the DIP Financing. The liens securing the DIP Financing are, nevertheless, subordinate to: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code, (ii) the professional fees and expenses incurred by the Debtors in these chapter 11 cases and approved by the Bankruptcy Court (together with the fees set forth in (i) the "Chapter 11 Costs"), and (iii) the Excepted Liens. The proposed DIP Financing does not include any acknowledgement of the extent, priority or validity of Ms. Weadock's liens or of the amount of Ms. Weadock's claim, nor does it violate any of the other restrictions contained in MLBR 4002-1(c).

In further support of this motion, the Debtors aver as follows:

---

[2] The Debtors reserve all of their rights, claims and defenses as to the extent, priority and validity of any liens asserted against their respective property.

3

774234

## JURISDICTION AND VENUE

1. This Court has jurisdiction over this Motion under 28 U.S.C. §§157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. §157(b)(2). Venue of this proceeding and this Motion in this District is proper under 28 U.S.C. §§1408 and 1409.

2. The bases for relief are Sections 105, 363 and 364 of the Bankruptcy Code, Bankruptcy Rule 4001 and MLBR 4001-2.

## BACKGROUND[3]

3. On May 4, 2020 (the "Petition Date"), the Debtors each commenced a chapter 11 case by filing voluntary petitions for relief under chapter 11 of the Bankruptcy Code.

4. The Debtors collectively operate the International Golf Club (the "International"), which includes two award winning golf courses, a fifty-four (54) room hotel, restaurant and function room. The original nine-hole golf course, built in 1901, was expanded to eighteen holes in 1954, becoming the "Pines Course." In 1972, famed golf course designer Robert Trent Jones modified the Pines Course to its current configuration, an award winning course that is rated as the longest and toughest course in America.

5. In 1999, the current ownership purchased the International and undertook a major expansion, including the construction of a second golf course, the "Oaks Course," designed by Tom Fazio. In 2001, the International officially opened for member play, making it one of the first private golf clubs in New England with two full golf courses.[4]

---

[3] Contemporaneously with the filing of this motion, the Debtors filed the *Affidavit of Craig Jalbert, Chief Restructuring Officer, in Support of First Day Motions* (the "Jalbert Affidavit") that contains, among other things, background facts regarding the Debtors, their operations, assets and liabilities.
[4] The International also operates a third, nine (9) hole golf course.

774234

6. In addition to its golf courses, the Debtors operate a boutique lodge and signature restaurant, providing a lifestyle destination resort and a full service corporate and social event platform.

7. The U.S. golf industry has been undergoing a substantial market correction in recent years following a 20 year boom in golf course construction, which saw more than 4,500 new courses built from 1986-2005. In that window, the U.S. added more courses than the total existing supply in any other country. Despite golf course closures outweighing new openings for more than ten years, there are still more than 16,000 golf courses in the United States, which is more than five times any other country in the world. Due to the glut of golf courses, The International was required to modify its membership model starting in 2008, changing from a membership that required a deposit of $65,000 and annual dues of $8,000 (a "Deposit Member"), to a model that requires only the annual dues (a "Non-Deposit Member"). Notwithstanding this, The International has seen membership requests continue to constrict, resulting in reduction in cash flow. The recent COVID-19 crisis, which required The International to cease operations, severely impacted The International's working capital, requiring the filing of these bankruptcy cases.

**A.    The Debtors.**

8. Arklow is a Massachusetts limited partnership, that owns approximately 700 acres of real estate (the "Real Estate") on which the International operates, consisting of the golf courses and associated buildings, and undeveloped land. Arklow also owns certain of the equipment necessary to operate the International, and the leases the rest, such as golf carts, mowers and turf equipment. The book value of Arklow's assets (exclusive of intercompany

774234

claims)[5] is approximately $16 million, with its real estate consisting of most of that value. Arklow has not obtained an appraisal of its assets, but believes that the fair market value of its assets is considerably less than the book value.

9.    The general partner of Arklow is Arklow, Inc., a Massachusetts corporation, and Arklow's limited partners are Florence Weadock, Brian Lynch, Daniel Weadock, Ann Specht and Kevin Weadock.

10.    IGC is a Delaware limited liability company whose sole member is Arklow. ICG provides administrative services to the International, including hotel management and managing the members of the International and holding their membership deposits. IGC leases the International's three (3) golf courses from Arklow. The book value of IGC's assets (exclusive of intercompany claims) is approximately $100,000. IGC has not obtained an appraisal of its assets. IGC's assets consist of computer and office equipment and furniture.

11.    As of the Petition Date, there were thirty-nine (39) active Deposit Members and approximately active 100 Non-Deposit Members of the International.

12.    Wealyn is a Massachusetts limited liability company whose members are Brian Lynch, Florence Weadock and Arklow. Wealyn manages the food and beverage services for the International. Wealyn's primary asset is its liquor license, the book value of which is approximately $100,000.

B.    **Liabilities.**

13.    As of the Petition Date, Arklow's liabilities consist of secured debt totaling approximately $9,000,000 and unsecured debt totaling approximately $10,400,000 as follows:

---

[5] Arklow and IGC each have inter-company claims against the other. Arklow has a claim against IGC on account of IGC's lease of the golf courses, and IGC has claims against Arklow on account of management and other services provided.

  a. Arklow owes approximately $54,000 in real estate taxes that are secured by a first priority lien on the Real Estate.

  b. In 2014, Arklow borrowed, on an unsecured basis, approximately $9,000,000 from Bank of America (the "<u>BofA Debt</u>") to fund the International's operations. As a condition to this loan, Bank of America required Florence Weadock to guaranty the debt and to collateralize her guaranty with securities. In exchange for Ms. Weadock's credit support, Arklow executed a guaranty to Ms. Weadock and secured the guaranty with a first priority mortgage in favor of Ms. Weadock on the Real Estate (the "<u>First Mortgage</u>"). Arklow received the entire proceeds of the Bank of America loan.

  c. In 1999, Arklow borrowed $10,000,000 from Ms. Weadock to purchase the Real Estate. Arklow owes Ms. Weadock approximately $10,400,000 on account of this loan. On or about May 29, 2019, Arklow granted Ms. Weadock a mortgage junior to the First Mortgage to secure this loan (the "<u>Second Mortgage</u>").[6]

  d. Arklow has non-priority unsecured trade and vendor debt totaling approximately $40,000.

  e. As of the Petition Date, three (3) parties had filed UCC-1 financing statements against Arklow, Fortress Credit Co., LLC (as assignee of GPSA Leasing, II), TCF National Bank, and DLL Finance, LLC. All three (3) of these UCC-1 filings are associated with equipment leases. Arklow is still reviewing the documents and reserves all of its rights, claims and defenses as to whether such entities have a claim against Arklow or a lien on any of its assets. Two other entities, Deer Credit and Agricredit Acceptance, LLC filed UCC-1 financing statements that lapsed more than eight (8) months prior to the Petition Date, and Arklow reserves all of its rights, claims and defenses as to whether such entities have a claim against Arklow or a lien on any of its assets.

14. As of the Petition Date, IGC had priority unsecured debt totaling approximately $24,000, consisting of its accrued payroll liability as of the Petition Date.[7] IGC's non-priority unsecured totaled approximately $9,444,000, consisting of (a) Deposit Member obligations totaling approximately $9,000,000, and (b) trade and vendor debt totaling approximately

---

[6] Because Ms. Weadock is an insider (as that term is defined in the Bankruptcy Code) of the Debtors, the Second Mortgage was recorded within the one (1) year look back period under Section 547 of the Bankruptcy Code.
[7] IGC has filed a motion seeking permission to pay its pre-petition payroll obligations.

7

774234

$444,000. Prior to 2008, in order to become a member of the International, a person is required to provide a deposit to the International. The membership rights and duties are described in the by-laws for the International. There are three different types of memberships in the International, each with its own differing deposit requirements. Upon the resignation of a Deposit Member, the International is obligated to return the resigned Deposit Member's deposit upon the earlier to occur of reissuance of the membership or thirty (30) years, provided that the member is a member in good standing. As of the Petition Date, the International had approximately thirty-eight active Deposit Members, who have provided membership deposits totaling $1,800,000, and approximately 138 resigned Deposit Members, with deposit claims totaling approximately $7,200,000. IGC is still analyzing all potential deposit claims, and reserves all of its rights, claims and defenses with respect to such claims.

15. As of the Petition Date, two (2) parties had filed UCC-1 financing statements against ICG, TCF National Bank and Yamaha Motor Finance Corporation. Both of these UCC-1 filings are associated with equipment leases. ICG is still reviewing the documents and reserves all of its rights, claims and defenses as to whether such entities have a claim against ICG or a lien on any of its assets.

16. As of the Petition Date, Wealyn had non-priority unsecured trade debt of approximately $60,000, and no secured or priority unsecured debts.

**ARGUMENT**

17. Attached as <u>Exhibit A</u> is a budget (the "<u>Budget</u>") setting forth estimated receipts and disbursements for the period from May 1, 2020, through August 31, 2020 (the "<u>Budget Period</u>"). The Debtors request the authority to borrow funds under the DIP Financing substantially in accordance with the Budget. The Debtors intend to seek a buyer for all or

8

substantially all of their assets, and that the sale of their assets will also generate proceeds for the Debtors' bankruptcy estates.

18. Section 364 of the Bankruptcy Code allows a debtor-in-possession to (a) obtain unsecured credit in the ordinary course of business, (b) obtain unsecured credit out of the ordinary course of business, (c) obtain credit with specialized priority and (d) obtain secured credit by granting a secured lien on property of the estate. *See* 11 U.S.C. § 364. If a debtor-in-possession cannot obtain post-petition credit on an unsecured basis, the Court may authorize credit that is secured by liens on the debtor's property.

19. Sections 364(c) and (d) of the Bankruptcy Code provide that the estate representative demonstrate that alternative sources of credit are not available under 364(a) or (b). *See In re Ames Dept. Stores, Inc.* 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990)("debtor is not required to seek credit from every possible source … [but only to] show that it has made a reasonable effort to seek other sources of credit available."). Against this backdrop, a Court will evaluate the facts and circumstances of a debtor's case, and will grant significant weight to an estate representative's business judgment regarding the necessity for obtaining the requested financing. *Id.* at 40.

20. In this case, with the Debtors operations having been closed due to the COVID-19 pandemic, and with existing liens on the Debtors' assets, it is unreasonable to expect that any other parties are prepared to provide financing on an unsecured or a junior secured basis.

21. Ms. Weadock will loan funds to the Debtors to permit the sale of the Debtors' assets in an orderly fashion based on the term sheet attached as Exhibit B, the primary terms and conditions of which are as follows:

    a.    Loan amount: Not to exceed $693,000

9

774234

b. Interest rate: Six percent (6%) per annum

c. Due date: the earliest to occur of (i) August 31, 2020; (ii) ten (10) days after the closing of a sale, approved by an order (the "Sale Order") of the Bankruptcy Court; (iii) ten (10) days after entry of an order confirming a chapter 11 plan in the Chapter 11 Cases (a "Confirmation Order"); or (iv) the occurrence of an event of default under the DIP Facility after the expiration of any applicable grace or cure periods.

d. Security: First priority interest in all existing assets of the Debtors, junior only to the Excepted Liens, the Chapter 11 Costs, and excluding causes of action under Chapter 5 of the Bankruptcy Code and their proceeds.

22. Based on the Budget, the Debtors propose to borrow approximately $693,000 during the Budget Period, without prejudice to the right to seek additional borrowings. Under the terms of the DIP Financing, the proposed post-petition lien will prime only Ms. Weadock's pre-petition liens. The post-petition lien for amounts advanced will include all assets of the Debtors, with the exception of avoidance actions and their proceeds. Absent the DIP Financing, the Debtors would be required to sell their assets under a forced liquidation, which would substantially de-value those assets. According, no creditors or parties in interest other than Ms. Weadock, therefore, will be prejudiced by the proposed priming lien.

## NOTICE

23. This motion has been served upon the United States Trustee, counsel for Ms. Weadock, the Debtors' twenty (20) largest creditors, the Internal Revenue Service, the Massachusetts Department of Revenue, and all parties who have requested notice in the Debtors' cases. The Debtors submit that such service is appropriate given the relief requested and the circumstances of the Debtors' cases.

[this space intentionally left blank]

774234

WHEREFORE, the Debtors requests that the Court enter an order: (a) approving the notice of this motion as described above; (b) authorizing the Debtors to borrow approximately $85,000 on an expedited basis in accordance with the Budget; (c) scheduling of a final hearing on the DIP Financing, without prejudice to the Debtors' ability to request to borrow additional funds if necessary; (c) granting Ms. Weadock post-petition priming liens in accordance with the terms of this motion for both the expedited DIP Financing and the final DIP Financing; and (d) granting such other relief as is just and proper.

        Respectfully Submitted,

        ARKLOW LIMITED PARTNERSHIP, THE INTERNATIONAL GOLF CLUB, LLC, and WEALYN, LLC,
        By their proposed counsel,

        /s/ *D. Ethan Jeffery*
        D. Ethan Jeffery (BBO #631941)
        MURPHY & KING, Professional Corporation
        One Beacon Street
        Boston, MA  02108-3107
        Tel: (617) 423-0400
        EJeffery@murphyking.com

Dated:  May 4, 2020

774234

**IN RE: ARKLOW LIMITED PARTNERSHIP, ET AL.**
**JOINT ADMINISTRATION REQUESTED**
**BANKRUPTCY NO. 20-40523**

**EXHIBIT A TO**

**DEBTORS' MOTION FOR (A) THE APPROVAL OF
DEBTOR-IN-POSSESSION FINANCING, (B) THE ENTRY OF
SCHEDULING ORDER REGARDING A CONTINUED HEARING ON
DEBTOR-IN-POSSESSION FINANCING, AND (C) ADDITIONAL RELIEF**

Exhibit A

The International Golf Club - Consolidated DIP Budget

| | Forecast May Expenses | Forecast June Expenses | Forecast July Expenses | Forecast August Expenses | Total Forecast Expenses |
|---|---|---|---|---|---|
| Payroll Expenses | $ 61,500 | $ 61,500 | $ 61,500 | $ 61,500 | $ 246,000 |
| GCM -Leases-TCF/TIAA | $ 20,250 | $ 20,252 | $ 20,252 | $ 20,252 | $ 81,006 |
| BCBS | $ 4,092 | $ 4,092 | $ 4,092 | $ 4,092 | $ 16,368 |
| Electric-EDF/NATL GRID-Utilities | $ 35,000 | $ 25,000 | $ 15,000 | $ 15,000 | $ 90,000 |
| Trash/Oil/Fuel-Utilities- | $ 4,875 | $ 2,000 | $ 1,000 | $ 1,000 | $ 8,875 |
| Comcast/Clocktower/Jonas Support/ATT | $ 3,500 | $ 3,500 | $ 3,000 | $ 3,000 | $ 13,000 |
| Real Estate Taxes | $ 18,500 | $ 18,500 | $ 18,500 | $ 18,500 | $ 74,000 |
| United States Trustee Fees | $ - | $ - | $ 4,875 | $ - | $ 4,875 |
| CRO | $ 10,000 | $ 10,000 | $ 10,000 | $ 7,500 | $ 37,500 |
| Professional Fees | $ 25,000 | $ 20,000 | $ 20,000 | $ 20,000 | $ 85,000 |
| Insurances | $ 5,935 | $ 10,000 | $ 10,000 | $ 10,000 | $ 35,935 |
| TOTAL | $ 188,652 | $ 174,844 | $ 168,219 | $ 160,844 | $ 692,559 |

**IN RE: ARKLOW LIMITED PARTNERSHIP, ET AL.
JOINT ADMINISTRATION REQUESTED
BANKRUPTCY NO. 20-40523**

**EXHIBIT B TO**

**DEBTORS' MOTION FOR (A) THE APPROVAL OF
DEBTOR-IN-POSSESSION FINANCING, (B) THE ENTRY OF
SCHEDULING ORDER REGARDING A CONTINUED HEARING ON
DEBTOR-IN-POSSESSION FINANCING, AND (C) ADDITIONAL RELIEF**

**$693,000 SECURED SUPER-PRIORITY DEBTOR IN POSSESSION
CREDIT FACILITY**

**Summary of Terms And Conditions**

The terms and conditions upon which Florence Weadock or her affiliate (the "Lender") may agree to extend credit to Arklow Limited Partnership, The International Golf Club, LLC and Wealyn, LLC (collectively the "Borrowers") are subject the approval by the Bankruptcy Court (as defined below) and the satisfactory completion of documentation that is reasonably acceptable to the Lender and the Borrowers. This term sheet does not include descriptions of all of the terms, conditions and other provisions that would be contained in the documentation relating to the DIP Facility (as defined below).

| | |
|---|---|
| **Borrower:** | Arklow Limited Partnership, The International Golf Club, LLC and Wealyn, LLC, each as a debtor and debtor in possession in their respective chapter 11 cases (collectively the "Chapter 11 Cases") under Title 11 of the United States Code, as amended (the "Bankruptcy Code") filed in the United States Bankruptcy Court for the District of Massachusetts (the "Bankruptcy Court"). |
| **Lender:** | Florence Weadock or her affiliate |
| **The DIP Loan Facility:** | A term loan facility made available to the Borrowers in a principal amount of up to $693,000 (the "DIP Facility"), to be funded as needed pursuant to a budget approved by Lender (the "Budget") upon the entry of one or more orders by the Bankruptcy Court approving the DIP Facility, which orders shall be reasonably satisfactory in form and substance to Lender; provided, however, that the Lender shall have no obligation to make any advances on, or after, August 31, 2020 even if the advances on the DIP Facility shall not have exceeded $693,000 in principal amount, except as provided under the "Events of Default" below concerning accrued, unfunded obligations. The Bankruptcy Court may enter an interim order approving the DIP Facility; provided that any lending in addition to that authorized in the interim order shall be subject to the entry of a final order approving the DIP Facility. All loans outstanding under the DIP Facility (the "Loans") shall become due and payable on the Termination Date (as defined below). |
| **Term:** | The period from the Closing Date to the earliest of (i) August 31, 2020; (ii) ten (10) days after the closing of a sale, approved by an order (the "Sale Order") of the Bankruptcy Court; (iii) ten (10) days after entry of an order confirming a chapter 11 plan in the Chapter 11 Cases (a "Confirmation Order"); or (iv) the occurrence of an event of default under the DIP Facility after the expiration of any applicable grace or cure periods (the "Termination Date"). |

**Closing Date:** Within two (2) business days following the date on which the Bankruptcy Court enters an interim order or a final order, as the case may be, approving the DIP Facility.

**Purpose:** Proceeds of the advances under the DIP Facility will be used solely to pay, in accordance with the Budget, the (i) post-petition operating expenses of the Borrowers incurred in the ordinary course of business, (ii) costs and expenses of administration of the Case, including United States Trustee fees and counsel fees, and (iii) other amounts expressly specified in the Budget.

**Interest:** Loans will bear interest at a rate per annum equal to six percent (6.0%). Interest shall be calculated on the basis of the actual number of days elapsed in a 360-day year.

**Default Interest:** During the continuance of an Event of Default (as defined in the loan documentation), advances, interest, fees and other amounts due will bear interest at a rate that is 2.0% per annum greater than the rate otherwise applicable to DIP Facility.

**Priority:** All amounts owing by the Borrowers under the DIP Facility at all times will constitute allowed super-priority administrative expense claims in the Chapter 11 Cases (and any successor case under chapter 7 of the United States Bankruptcy Code) under section 364(c)(1) of the Bankruptcy Code, having priority over all pre-petition and post-petition liabilities, including any and all administrative expenses of the kind specified in Bankruptcy Code §§ 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 364(c)(1) and/or 726.

This priority (and the liens described below) will be junior and subordinate only to: (i) all fees required to be paid to the Clerk of the Bankruptcy Court and to the Office of the U.S. Trustee under section 1930(a) of title 28 of the United States Code; (ii) the professional fees and expenses incurred by the Borrowers in the Chapter 11 Cases and approved by the Bankruptcy Court (together with the amounts set forth in section (i), above, the "Chapter 11 Costs"); and (iii) the Excepted Liens (as defined below). To the extent the Chapter 11 Costs have not already been paid in full when all or any portion fo the Lender's collateral is sold, the proceeds of the sale of such collateral shall first be used to pay any unpaid Chapter 11 Costs, and second shall be remitted to the Lender. The term "Excepted Liens" shall mean, collectively: (a) liens securing real estate taxes, and (b) security interests in equipment leased to Arklow and IGC asserted by the lessors of such equipment, to the extent such liens are valid and perfected, and only on the equipment secured by such liens.

| | |
|---|---|
| **Security:** | All amounts owing by the Borrowers under the DIP Facility will be secured by a first priority perfected security interest in and lien on all assets (tangible, intangible, real, personal and mixed) of the Borrowers, whether now owned or hereafter acquired, including, without limitation, accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real estate, leasehold interests, contracts, patents, copyrights, trademarks and other general intangibles, and all products and proceeds thereof (excluding, however, avoidance power actions pursuant to chapter 5 of the Bankruptcy Code), all as more particularly described in any mortgage and security agreement executed by Borrowers (collectively the "<u>Collateral</u>"). The liens granted to Lender shall be senior to and shall prime all pre-petition liens. |
| **Conditions Precedent to Closing/Funding** | Borrowers shall provide reporting concerning Borrowers' operations as follows: (i) a bi-weekly disbursement report, (ii) a monthly budget to actual reconciliation, and (iii) a copy of the monthly operating reports provided to the Office of the United States Trustee.<br><br>The loan documentation will contain other conditions to the closing of the DIP Facility customarily found in similar debtor in possession financings, and in any event including without limitation:<br><br>• All documentation relating to the DIP Facility shall be in form and substance reasonably satisfactory to the Lender.<br><br>• The Lender shall have a valid and perfected first priority, priming lien on and security interest in the Collateral.<br><br>• The Bankruptcy Court shall have entered an order, in form and substance satisfactory to the Lender, authorizing and approving the DIP Facility and the transactions contemplated thereby, including, without limitation, the granting of the super-priority status, security interests and liens to Lender, which order shall be in full force and effect, shall not have been reversed, vacated or stayed and shall not have been amended, supplemented or otherwise modified without the prior written consent of the Lender. In the event that the Bankruptcy Court enters an interim order approving the DIP Facility; any lending in addition to that authorized in the interim order shall be subject to the entry of a final order approving the DIP Facility. |
| **Events of Default:** | The loan documentation will contain customary events of default and, shall include, without limitation, the following: (i) failure to make payments when due; (ii) impairment of loan documentation or security; (iii) dismissal of the Chapter 11 Cases or conversion to a chapter 7 case; (iv) appointment of a chapter 11 trustee; (v) granting of relief from the |

3

automatic stay to permit foreclosure on any assets of the Borrowers; (vi) entry of an order granting any super-priority claim which is senior or pari passu with the Lender's claims under the DIP Facility; (vii) reversal, vacation or stay of the effectiveness of the Interim Order or the Final Order; (viii) the filing of a plan of reorganization that, absent the express written consent of Lender, does not provide for the payment in full, in cash, on the effective date of such plan of all obligations of the Borrowers to the Lender in respect of the DIP Facility.

In event of an Event of Default, Lender shall have no obligation to make any further advances on the DIP Facility except to the extent of accrued and unpaid obligations that have then been incurred by Borrowers consistent with the Budget, including unused but budgeted professional fees and expenses for Borrowers's counsel for fees and expenses incurred after such event of default.

Upon the occurrence of the earlier of (a) an Event of Default and the provision of five (5) business day's written notice thereof by Lender to the Borrowers, Borrowers's counsel and the Office of the U.S. Trustee (which notice may be given by facsimile or e-mail transmission) or (b) the Termination Date, Lender shall have the right to move the Bankruptcy Court on an expedited basis for appropriate relief, including, but not limited to, relief of the restrictions of 11 U.S.C. § 362 or under any other section of the Bankruptcy Code or applicable law or rule, and seek authorization to take immediate action to protect the Collateral from harm, theft and/or dissipation and to exercise all of its contractual, legal and equitable rights and remedies as to all or such part of the Collateral as Lender shall elect.